IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYVLANIA

| | |
|---|---|
| STEPHEN DRIZOS, | : |
| | : No. |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| PNC INVESTMENTS LLC d/b/a PNC INVESTMENTS, | : **JURY TRIAL DEMANDED** |
| | : |
| Defendant. | : |

## COMPLAINT

Plaintiff Stephen Drizos ("Mr. Drizos") hereby files this Complaint as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA"), as amended, and the Family Medical and Leave Act, 29 U.S.C. § 2611, *et seq.* ("FMLA"). This Court has supplemental jurisdiction over the state law claims pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.C.S.A. § 951, *et seq.* ("PHRA"). This Court has jurisdiction over these claims under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) and (4), and 28 U.S.C. § 1367.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### PARTIES

3. Mr. Drizos is an adult individual residing in the Western District of Pennsylvania.

4. Defendant PNC Investments LLC ("PNC Investments") is a Delaware limited liability company with a principal place of business at 300 Fifth Avenue, 26th Floor, Pittsburgh, Pennsylvania 15222. At all relevant times, the events complained of herein involved PNC Investments' location at 300 Mount Lebanon Boulevard, Pittsburgh, Pennsylvania 15234. At all

relevant times, PNC Investments was acting by and through its duly authorized administrators, agents and/or employees, who at all relevant times were acting within the course and scope of their employment, and/or in accordance with its policies, customs and practices.

## FACTS

5. PNC Investments employs more than 20 employees and is an affiliate of The PNC Financial Services Group, Inc., the parent company of PNC Insurance Services, LLC, PNC Bank, National Association and PNC Investments.

6. PNC Investments is a registered broker-dealer and investment advisor and a member of the Financial Industry Regulatory Authority ("FINRA") and Securities Investor Protection Corporation ("SIPC").

7. PNC Investments offers securities products, brokerage services and managed account advisory services for individuals and entities alike.

8. At all relevant times, Mr. Drizos was a financial advisor for PNC Investments where he provided investment advice and services to customers and clients.

9. Mr. Drizos' primary job responsibility included increasing production revenue on behalf of PNC Investments by obtaining new assets under management while managing current assets under management (known as a production or revenue goal).

10. Mr. Drizos received excellent performance reviews during each year of his employment with PNC Investments.

11. In 2016, Mr. Drizos received numerous awards and accolades for the way in which he managed and increased his production goal during his employment with PNC Investments.

12. At the same time, because of a personal matter, Mr. Drizos lost his five-year sobriety with alcohol.

13. Mr. Drizos surpassed his 2016 production goal despite his loss of sobriety.

14. Mr. Drizos' direct supervisor, Wendy O'Brien ("O'Brien"), became aware of his loss of sobriety around January 2017 because Mr. Drizos told O'Brien about the same.

15. Also, in January 2017, O'Brien, knowing that Mr. Drizos had lost his sobriety, increased his production goal so that it was drastically higher than the production goal increases she had implemented for other financial advisors who were similarly employed by PNC Investments for the same period and who did not struggle with alcoholism.

16. In March 2017, because of—among other things—the increased stress in connection with his increased production goal, Mr. Drizos voluntarily chose to attend rehabilitation with the Hazelden Betty Ford Foundation in Naples, Florida ("Betty Ford") to correct his loss of sobriety and his failed attempts with alcoholics anonymous to correct the same.

17. At this time, Mr. Drizos voluntarily chose to attend a specific rehabilitation program at Betty Ford where he was permitted to work while receiving treatment.

18. Mr. Drizos' business as a financial advisor with PNC Investments went unaffected during this rehabilitative process and he simultaneously completed his treatment.

19. Mr. Drizos physically returned to work in early April 2017.

20. In late May 2017, Mr. Drizos again lost his sobriety and again voluntarily chose to attend rehabilitation at Betty Ford to correct his drinking habits, this time seeking full inpatient treatment.

21. Mr. Drizos successfully completed a 30-day inpatient program at Betty Ford and physically went back to work with PNC Investments while attending outpatient therapy at Gateway Rehabilitation Center in late June 2017.

22. When Mr. Drizos returned from Betty Ford after this rehabilitative treatment, he learned that O'Brien intentionally failed to review his accounts to maintain their compliance with various banking and securities laws.

23. Mr. Drizos was thus required to process a substantial amount of delinquent accounts to maintain their compliance upon returning from his inpatient rehabilitation.

24. O'Brien knew that leaving Mr. Drizos' accounts delinquent while he was undergoing rehabilitative treatment would cause a stressful situation upon his return and increase the likelihood that he would fail in his employment and again lose his sobriety.

25. Mr. Drizos nevertheless successfully and timely made all his accounts compliant.

26. During the time in which Mr. Drizos had returned from inpatient rehabilitation and was making his accounts compliant, Amy Rhome Smith ("Smith"), a branch manager with PNC Bank, National Association, stated to him that "people like him could never get sober" and that "once an alcoholic, always an alcoholic."

27. Mr. Drizos subsequently learned that Smith was directly and indirectly influencing O'Brien to get him fired.

28. Mr. Drizos also learned that Smith began keeping a daily inventory of his whereabouts and that she had influenced O'Brien to likewise begin keeping a record log of when and where he was each day.

29. O'Brien, either on her own or because of Smith, began demanding that Mr. Drizos call her personally to tell her where he was, what he was doing and when he would be in on each occasion where he was not in the office by 9:00 a.m., even though similarly situated financial advisors were not required to do so.

30. From June 2017 to June 2018, although he continued to meet or exceed his production goal, Mr. Drizos became substantially limited in caring for himself, eating, sleeping, concentrating, thinking, communicating and/or working—losing a significant amount of weight in the process.

31. In January 2018, Mr. Drizos sought mental health treatment to address his substantial limitations in caring for himself, eating, sleeping, concentrating, thinking, communicating and/or working.

32. Mr. Drizos told O'Brien at that time that he was seeking mental health treatment.

33. Mr. Drizos was subsequently diagnosed with bi-polar disorder and prescribed medications for that diagnosis and told O'Brien about that diagnosis and his medications.

34. In early June 2018, O'Brien demanded that Mr. Drizos sign a final written warning because he was not in the office by 9:00 a.m. as she required of him in a way that was different from those financial advisors with whom he was similarly situated.

35. No other similarly situated financial advisor was ever required to sign a final written warning for failing to be physically present at the branch location by 9:00 a.m.

36. Around one week after O'Brien demanded that Mr. Drizos sign the final written warning, Mr. Drizos called O'Brien to notify her of his intent to use short term disability or leave under the Family and Medical Leave Act ("FMLA") for additional and continuing rehabilitation for both alcohol addiction and mental health treatment.

37. Mr. Drizos advised O'Brien that he was discussing that issue with human resources and that he would keep her apprised of any updates.

38. Mr. Drizos subsequently learned a few days later that he would be fully covered under the FMLA for his rehabilitation and notified O'Brien of the same.

39. O'Brien terminated Mr. Drizos from his employment days later, on June 28, 2018, while he was in the process of filing for leave under the FMLA.

40. At the time of his termination, Mr. Drizos was on pace to achieve his highest production year since beginning his employment with PNC Investments.

41. At the time of his termination, Mr. Drizos was exceeding the production goal that had been set for him by O'Brien by 44 percent.

42. Mr. Drizos' use of alcohol never adversely affected his job performance or conduct to the extent that he could be considered not qualified for his position, which is proved through the positive progression of his production goals.

43. Mr. Drizos was never under the influence of alcohol or drugs in the workplace, nor did he ever test positive for drug usage while employed by PNC Investments.

44. Because of the conduct described herein, Mr. Drizos has suffered lost wages and other remuneration, as well as embarrassment, humiliation and other emotional distress.

## COUNT I

### Disability Discrimination under the ADA

45. All paragraphs are incorporated herein by reference.

46. Mr. Drizos was disabled within the meaning of the ADA because he had physical and mental impairments because of an alcohol and/or drug addiction and bi-polar disorder that substantially limited one or more major life activities.

47. Because of his alcohol and/or drug addiction and bi-polar disorder, Mr. Drizos is substantially limited in caring for himself, eating, sleeping, concentrating, thinking, communicating and/or working.

48. In the alternative, Mr. Drizos had a record of such physical and mental impairments as evidenced by his seeking rehabilitative treatment for alcohol addiction in March and May 2017, of which PNC Investments was aware, and as evidenced by his bi-polar disorder diagnosis in January 2018, of which PNC Investments was aware.

49. In the alternative, PNC Investments regarded Mr. Drizos as disabled, even if he did not have an actual physical or mental impairment that substantially limited one or more major life activities, because PNC Investments thought Mr. Drizos was disabled within the meaning of the ADA and/or treated or dealt with him as though he had such an impairment.

50. Mr. Drizos was otherwise qualified to perform the essential functions of his job as a financial advisor, with or without reasonable accommodations from PNC Investments.

51. Mr. Drizos suffered an adverse employment decision because of PNC Investments' discrimination against him because of his disability and/or because it regarded him as having a disability.

## COUNT II

### Failure to Accommodate under the ADA

52. All paragraphs herein are incorporated by reference.

53. Mr. Drizos requested reasonable accommodations for his disabilities related to his alcohol and/or drug addiction and bi-polar disorder when he requested and applied for leave under the FMLA and when he otherwise requested time-off to attend rehabilitation in June 2018.

54. Despite being aware of Mr. Drizos' physical and mental impairments, PNC Investments took no action to reasonably accommodate them.

55. PNC Investments likewise failed to initiate the interactive process with Mr. Drizos to determine his limitations and any possible way of accommodating his physical and mental impairments.

56. Reasonable accommodations could have been provided to Mr. Drizos that would not have imposed an undue hardship on PNC Investments, such as providing Mr. Drizos with the leave to which he was entitled under the FMLA (or under his short-term and/or long-term disability plan with PNC Investments) to seek rehabilitative treatment.

57. Mr. Drizos was otherwise qualified to perform the essential functions of his job with reasonable accommodations by PNC Investments.

58. Mr. Drizos suffered an adverse employment decision because PNC Investments failed to provide him with reasonable accommodations for his disabilities.

## COUNT III

### Retaliation under the ADA

59. All paragraphs herein are incorporated by reference.

60. Mr. Drizos requested reasonable accommodations from PNC Investments under a reasonable, good faith belief that he was entitled to request those accommodations from PNC Investments.

61. Mr. Drizos suffered an adverse employment decision by PNC Investments in retaliation for requesting reasonable accommodations for his disabilities.

## COUNT IV

### Interference under the FMLA

62. All paragraphs herein are incorporated by reference.

63. Mr. Drizos was an eligible employee under the FMLA.

64. PNC Investments is subject to the FMLA's requirements.

65. Although Mr. Drizos was entitled to leave under the FMLA, he was terminated by PNC Investments and thus denied the benefits to which he was entitled under the FMLA after he gave notice of his intention to take FMLA leave.

## COUNT V

### Retaliation under the FMLA

66. All paragraphs herein are incorporated by reference.

67. Mr. Drizos was terminated from PNC Investments simultaneously with or shortly or immediately after invoking his right to FMLA-qualifying leave, sufficiently raising an inference of retaliation.

## COUNT VI

### Disability Discrimination, or, in the alternative, Failure to Accommodate, under the PHRA

68. All paragraphs herein are incorporated by reference.

69. For all the reasons stated in Counts I and II above, PNC Investments discriminated against Mr. Drizos in violation of the PHRA by terminating his employment and/or otherwise failing to accommodate him.

## COUNT VII

### Retaliation under the PHRA

70. All paragraphs herein are incorporated by reference.

71. For all the reasons stated in Count III above, PNC Investments retaliated against Mr. Drizos in violation of the PHRA by terminating his employment for requesting reasonable accommodations for his disabilities.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Drizos requests that this Court grant the following relief where applicable:

a. That PNC Investments be required to compensate him for back pay, front pay and other damages in the form of lost wages, and lost or reduced benefits, with interest until the date of any verdict as to be determined at trial;

b. That PNC Investments compensate him for all other applicable compensatory damages in an amount to be determined at trial;

c. Punitive damages in an amount to be determined at trial;

d. Liquidated damages in an amount to be determined at trial;

e. Attorney's fees and costs; and

f. All other relief this Court deems just and proper.

Respectfully submitted,

THE LAW OFFICES OF TIMOTHY P. O'BRIEN

/s/ Alec B. Wright
Alec B. Wright, Esquire
Pa. ID No. 316657

Henry W. Oliver Building
535 Smithfield Street, Suite 1025
Pittsburgh, PA 15222

(412) 232-4400
(412) 232-3730 (Fax)
abw@obrienlawpgh.com

*Counsel for Plaintiff*